**NATIONAL BUSINESS SERVICES, INC., d/b/a Advertising Specialty Institute, Plaintiff,**

v.

**Roni S. WRIGHT, Defendant.**

**No. CIV.A. 98–1593.**

United States District Court,
E.D. Pennsylvania.

April 21, 1998.

Martin J. Black, Cynthia L. Randall, David M. Howard, Philadelphia, PA, for Plaintiff.

Francis X. Manning, Lee A. Rosengard, Philadelphia, PA, for Defendant.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff seeks to enforce two restrictive covenants — a non-compete agreement and a non-disclosure agreement — entered into as part of an employment contract it made with defendant. Pursuant to the agreement of the parties, the trial of this action on the merits was consolidated with the preliminary injunction hearings held on April 7 and April 10, 1998. Fed.R.Civ.P. 65(a)(2). After thoroughly reviewing the evidence presented and the relevant law, I make the following findings of fact and conclusions of law. I shall

grant plaintiff's request to enforce the restrictive covenants against defendant.

## I. Facts

Plaintiff National Business Services ("NBS") d/b/a Advertising Specialty Institute ("ASI"), is a Pennsylvania corporation, with its principal place of business in Langhorne, Pennsylvania. ASI sells information products and services in print and electronic form to the advertising specialty and promotional product industry. ASI markets its products throughout the United States. Its customers include both suppliers and distributors of advertising products.

Defendant Roni S. Wright ("Wright") is an individual citizen of the State of Florida, who resides in Crystal Beach, Florida. For the past thirteen years, Wright has worked in the advertising specialty industry. Wright was an employee of ASI from July 31, 1995 to March 17, 1998 (Ex. P–3; P–12; P–13).[1]

The advertising specialty industry, also known as the promotional products industry, revolves around suppliers, who place slogans and insignias on merchandise, and distributors, who purchase products from suppliers, and sell them to consumers. (Cohn, p. 6; Klein, p. 218). There are approximately 1500 suppliers in the advertising specialty industry in the United States. (Hughes, p. 169). There are over 15,000 distributors in the United States that sell specialty products. (Hughes, p. 169). Two principal companies provide sales, marketing, and information services to suppliers and distributors in the advertising specialty industry: ASI and Impact. (Cohn, p. 12; Klein, p. 218).

Impact, like ASI, sells information products and services in print and electronic form to the advertising specialty and promotional product industry. Impact and ASI have a history of aggressive competition: they pro-duce and market similar products and serve the same customers. (Klein, pp. 218–20).[2]

Wright was an employee of Impact Group ("Impact") for ten years prior to joining ASI, from 1985 to 1995. (Klein, p. 229). Wright worked her way up from selling catalogs to the position of Acting Vice President of Impact. (Wright, pp. 120–21). However, Peter Klein ("Klein"), the Chairman of Impact, told Wright that he would not make her a permanent Vice President, and demoted her from the position of Acting Vice President, because, although Wright is Jewish, she did not possess what he called the "Jew gene." Wright understood this comment to mean that Klein did not believe she was "management material." (Wright, pp. 74–75). During the time Wright worked for Impact, she worked only with print, not electronic, materials. (Wright, p. 76). When Wright left Impact, in early 1995, she did not have another job in the advertising specialty industry. (Wright, p. 76).

Wright first discussed employment at ASI in May 1995 with the Chairman of the Board of ASI, Norman Cohn ("Cohn"). (Wright, pp. 79–80, 126–27; Cohn, pp. 15–17). Cohn emphasized to Wright that ASI could only offer her a job if she signed a non-compete agreement. (Cohn, p. 17). Wright understood that every ASI employee must sign a non-compete agreement. (Wright, p. 80). Wright agreed to sign the non-compete agreement and emphasized that she would never return to work for Impact. (Wright, p. 83).

After discussing employment at ASI with Cohn, Wright traveled to ASI in Langhorne, Pennsylvania to further interview for a position at ASI. Wright was hired by ASI to launch a new Internet product, Promomart, to distributors. Wright had no prior Inter-

---

1. All citations are to the transcript of the April 7, 1998 preliminary injunction hearing and to the exhibits introduced at the hearing.

2. Impact and ASI have been involved in two litigations over the use of confidential and proprietary information. Shortly after Impact was formed, ASI sued Impact for allegedly using ASI's confidential and proprietary name and address information. Impact counterclaimed on antritrust grounds. The case settled, and as part of the settlement agreement, Impact is permitted to purchase ASI's information products and to be listed as both a supplier and a distributor within ASI's publications in exchange for a royalty payment. (Klein, pp. 224–25). A second case was filed on similar grounds and settled. The settlement agreement is covered by a confidentiality agreement. (Klein, pp. 224–25). Although these litigations are important to understanding the relationship of ASI and Impact in the advertising specialty industry, they are not directly relevant to the instant case.

net experience when she began working at ASI. (Wright p. 77; Lovell, p. 198).

On August 1, 1995, Wright's second day of work for ASI, she signed an employment terms letter, which specified the compensation and benefits of her employment. (Ex. P–3; Wright, p. 129). Wright believed that the employment terms letter was the non-compete agreement that she and Cohn had discussed. (Wright, p. 86). The employment terms letter did not contain a non-competition or non-disclosure clause, but did expressly state that employee must sign the "NBS Covenant Agreement" and the "NBS Employee Agreement," in order to receive a "NBS Employee Manual." (Ex. P–3; Wright, p. 85).

On August 8, 1995, Eli Lawrence, an in-house lawyer for ASI, called Wright and told her that he was sending her a document by express mail to which she should pay "very close attention," and which she should sign and return right away. (Wright, pp. 89–90). On August 9, 1995, Wright received a document entitled "Agreement." (Wright, pp. 90–91; Ex. P–1, P–3).

The Agreement included the following covenants:

2.3 *NONCOMPETITION.* During the term of Employee's employment with NBS and for a period of 12 months thereafter, Employee shall not, except with NBS's express prior written consent, or except in the proper course of his employment with NBS, directly or indirectly, in any capacity, for the benefit of any Person:

2.3.1 Solicit, interfere with or divert any Person who is or during such period becomes a customer, supplier, employee, salesman, agent or representative of NBS, in connection with any business in competition with NBS.

2.3.2 Establish, engage, own, manage, operate, join or control, or participate in the establishment, ownership, management, operation or control or be a director, officer, employee, salesman, agent or representative of, or be a consultant to, any Person in any business in competition with NBS in any state where NBS now conducts or during such period begins conducting any material business.

2.3.3 Solicit, divert or induce any of NBS' employees to leave or to work for any person with which employee is connected.

2.2 *NONDISCLOSURE.* At all times during and after the term of Employee's employment with NBS, Employee shall not, except with NBS's express prior written consent, or except in the proper course of his employment with NBS, directly or indirectly, communicate, disclose or divulge to any Person, or use for his own benefit or the benefit of any Person, any confidential or proprietary knowledge or information, no matter when or how acquired, concerning the conduct and details of NBS's business including, without limitation, particular methods of operation, technical information, trade secrets, and confidential plans, practices and information relating to NBS's products, services, marketing and customers.

The Agreement also contained a provision that made every idea Wright had about ASI's business during her employment the exclusive property of ASI (Ex. P–1, ¶ 2.1), a provision requiring Wright to return all ASI property on the termination of her employment (Ex. P–1, ¶ 2.4), as well as a provision that, in the event of a breach, ASI would be irreparably harmed and entitled to injunctive relief (Ex. P–1, ¶ 2.5).

Wright signed the Agreement without reading it carefully. (Wright, pp. 90–91, 128). Wright signed the Agreement below the following statement: "Having read and understood this Agreement, the parties enter into and agree to the terms contained herein of their own free will and accord." (Ex. P–1). Wright realized that the agreement was something she needed to sign "for [her] employment." (Wright, p. 90). When Wright signed the agreement, on August 9, 1995, she had been an ASI employee for 10 days. (Wright, p. 130). The agreement read in part: "In consideration of Employee's promises and covenants contained herein, NBS [ ] agrees to hire employee." (Ex. P–3, § 1).

The employment terms letter signed by Wright on August 1, 1995 required a counter-signature by a Senior Vice President of ASI. (Ex. P–3). The Senior Vice President did not sign Wright's employment terms letter until August 9, 1995, when Wright signed the

Agreement sent to her by Lawrence containing the non-compete and non-disclosure covenants. (Ex. P–1, P–3).

During her employment at ASI, Wright held two different positions. Wright worked for two years as Internet Distributor Sales Manager for ASI. (Wright, pp. 70–72). Wright's primary responsibility in this position was to launch ASI's product, Promomart, to all of ASI's customers. (Wright, pp. 70–72). Wright had contact with customers and industry members all over the United States. (Wright, pp. 121–22).

In the summer of 1997, Wright assumed the function of National Account Manager for Distributor Sales. (Wright, pp. 183–84). Wright had responsibility for selling all of ASI's products, both print and electronic, to 38 of ASI's biggest distributor clients. (Wright, pp. 70–72; Lovell, p. 201). In January 1998, Wright's title formally changed to reflect her new responsibilities. (Lovell, p. 201).

During her employment at ASI, Wright's duties included primary responsibility for Internet sales to distributors; collecting customer feedback on products; and attending quarterly management meetings regarding Internet products (including discussion of product development, technical issues, marketing, and competitors). (Ex. P–29; Lovell, pp. 198–203). Although Wright was not part of ASI's management (Cohn, pp. 38–39; Lovell, p. 194), Wright had access to ASI's products prior to their introduction on the market, and was familiar with confidential information, relating to manufacturing, research, product development, marketing strategies, advertising plans, pricing, and customers. (Ex. P–29; Lovell, sealed transcript). Wright received extensive memoranda relating to management meetings which described the issues, problems, and initiatives Cohn intended to discuss, as well as the participants' responses. (Lovell, sealed transcript; Ex. P–29). For example,

Wright knew which customers had stopped purchasing ASI products, and the reasons given by those customers for cancellation. (Lovell, sealed transcript; Ex. P–29). Wright also knew plans for future products and product improvements. (Cohn, p. 20). Much of the information about ASI that Wright possesses is only valuable for a limited time because of rapid changes in the industry, particularly in the Internet sphere. (Ex. P–29; Lovell, sealed transcript).

Wright was one of ASI's top sales persons for both electronic and print products. (Lovell, sealed transcript). Wright developed relationships with hundreds of customers and potential customers of ASI. (Cohn, pp. 58–61; Lovell, sealed transcript). In her position as Internet Distributor Sales manager, Wright sold ASI's Promomart to at least 200 customers. (Wright, sealed transcript).

Before Wright began work at ASI, she had little Internet experience. (Wright, p. 77). Wright is now considered an expert on Internet information products in the advertising specialty industry. (Wright, pp. 120–22; Lovell, p. 203). Wright sold products and spoke about the Internet at industry meetings throughout her employment at ASI. (Lovell, p. 203).

On February 12, 1998, Wright had lunch with Sarah Macario ("Macario"), President of Impact, and a friend of Wright's, and Wright and Macario discussed employment opportunities for Wright at Impact. (Wright, p. 179).

Wright told Macario about her August 9, 1995 non-compete agreement with ASI. (Wright, pp. 179–80). Before giving Macario a copy of the non-compete agreement, Wright requested a confidentiality agreement. (Wright, pp. 179–80; Klein, p. 241). Wright requested the confidentiality agreement in order to keep her discussions with Impact confidential, so that no one would learn that Wright was considering leaving ASI. (Wright, p. 179; Klein, p. 241).[3]

---

3. Although it is not material to this permanent injunction decision, the parties brought out the fact that after Impact agreed to the confidentiality agreement, Wright gave Macario a copy of what she thought was the non-compete agreement she had signed with ASI. (Wright, pp. 130–31). The Agreement that Wright gave Macario was not a copy of the Agreement she had signed

with ASI, but a different version, which, in addition to the terms in Wright's contract, also contained a paragraph restricting the employee from working for distributors or suppliers. At the time Wright gave the document to Macario, she mistakenly believed it to be a copy of the Agreement she had signed. (Wright, 130–134; Ex. D–1).

On March 5, 1998, Macario gave Wright a "Memo of Understanding" which described the position that Impact was offering Wright. (Ex. P–10).

On March 17, 1998, Wright wrote a letter to Cohn informing him that she intended to resign her position at ASI and pursue employment with Impact, her former employer. (Ex. P–12).

On March 18, 1998, ASI's Vice President of Sales, Christine Lovell ("Lovell"), called Wright and told her that if Wright were unhappy, ASI would find her another job at ASI or a related business. (Wright, p. 106). Wright did not express interest in another job at ASI or a related business. (Wright, p. 106).

Cohn wrote back to Wright on March 18, 1998, asking her to remain at ASI and offering her other opportunities at ASI. (Ex. P–14). Cohn also notified Wright that ASI would enforce the covenant not to compete, which Wright had signed, if she went to work for Impact. (Ex. P–14). Cohn is still willing to offer Wright a job in another one of his companies. (Cohn, p. 30).

Wright entered into an employment agreement with Impact on March 25, 1998. (Ex. P–11;). Wright's employment agreement with Impact provides that: "Impact shall employ Roni Wright ("Wright") as Vice-President of its Internet services division." The agreement outlines Wright's responsibilities to (a) manage and direct the sales and marketing activities; (b) hire and fire all employees; (c) plan marketing and sales activities; (d) confer with product development personnel to provide customer feedback and requests; (e) set all business operational policies and goals; and (f) participate as a member of Impact's executive committee. (Ex. P–11, ¶ 2). Impact agreed to pay Wright a yearly base salary of $80,000. (Ex. P–11, ¶ 4). This salary would be a $25,000 per year increase from Wright's salary at ASI. (Wright, p. 97). In addition, if Wright met certain performance targets, the Internet Services Division would become a separate corporation, with Wright as president, if 80% of the shareholders of Impact so agreed. (Ex. P–11, ¶¶ 5–6; Wright, pp. 97–99; Klein, p. 269).

As part of the employment agreement, Impact recognized that the covenants Wright had entered into with ASI could affect the type of work she could do at Impact, and agreed to offer Wright another job at the same compensation, but with different responsibilities until Wright could assume the position of Vice–President of Internet Services. (Ex. P–11, ¶ 7). Peter Klein, Chairman of Impact, would be willing to offer Wright another job at Impact, such as in a customer service position at Impact Data and Information Services Company, ASI's direct competitor, or as a liaison to the industry's non-profit trade association, to which both Impact and ASI are trying to sell products. (Klein, pp. 244–45, 275–76).

The employment agreement with Impact also provides that Impact would "assume full costs of defending Employee in any action brought by the Third Party," and Impact "shall indemnify and hold Wright harmless, subject to the condition that Impact shall have final determination as to how such defense be conducted." (Ex. P–11, ¶ 8).

Wright has not sought employment with any supplier or distributor in the advertising specialty industry. (Wright, p. 106). Nor has she sought employment outside of the advertising specialty industry. (Wright, pp. 106–07, 190). There are over 200 suppliers in Florida, where Wright resides, and over 1,000 distributors. (Lovell, sealed transcript). Wright is well known throughout the industry, both because of her work at ASI, and because of her involvement in both national and regional trade associations (Wright, p. 107). For example, while working at ASI, Wright served as President of the Florida Professional Products Association. (Wright, p. 107). ASI's expert witness testified that Wright's experience would make her a "most desirable" candidate for employment with a supplier or distributor. (Holt, pp. 139–44). Wright's expert witness agreed that she could easily find another job in the industry, although it might take some time for her to earn a commensurate income. (Hughes, pp. 165–71).

## II.  Discussion

■ In deciding whether to grant a permanent injunction, I must consider whether:

(1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably harmed by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest. *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Ed.*, 84 F.3d 1471, 1477 nn. 2–3 (3d Cir.1996).

## A. Actual Success on the Merits

Pennsylvania law controls the interpretation of this case, pursuant to express agreement of the parties. Ex. P–1, ¶ 3.4. Pennsylvania courts disfavor restrictive covenants; however, the covenants that ASI seeks to enforce are enforceable under Pennsylvania law, if they are: (1) ancillary to the taking of employment; (2) supported by adequate consideration; (3) reasonably limited in time and geographic scope; and (4) reasonably designed to safeguard a legitimate interest of the former employer. *See Gagliardi Bros. v. Caputo*, 538 F.Supp. 525, 527 (E.D.Pa.1982); *Thermo–Guard, Inc. v. Cochran*, 408 Pa.Super. 54, 64–66, 596 A.2d 188, 193–94 (1991).

The covenants apply to the present situation, that is, the non-compete covenant prohibits Wright from accepting employment with a competitor within one year of the termination of her employment with ASI: Impact is a competitor and Wright seeks to work for Impact within one year of ending employment with ASI. (Ex. P–1, ¶ 2.3). The non-disclosure covenant took effect as soon as Wright signed it. (Ex. P–1.¶ 2.2). Wright does not contest that she violated the terms of the covenants, but argues that the covenants are unenforceable.

Wright argues that the covenants are unenforceable against her for several reasons:

▶ There was no meeting of minds as to the meaning of the non-compete covenant: although she signed the covenant, she did not read it carefully, and her understanding of a non-compete covenant at the time she signed it was that such a covenant prevented her from stealing secrets from ASI or starting her own competitive company.

▶ The covenants were not ancillary to her taking of employment with ASI, because she signed the Agreement containing the covenants ten days after beginning employment.

▶ The covenants are unreasonable in temporal and geographical scope: in the information industry, Wright argues, one year is a very long time, and her primary responsibilities were for 38 distributors, not for every distributor across the nation.

▶ The covenants do not protect a legitimate business interest of ASI: Wright's goodwill and understanding of the industry belong to her, not to ASI, and are the product of her hard work. Wright will not reveal ASI's confidential information under any circumstances.

I will address these arguments in turn.

Wright's testimony that she did not read or understand what she had agreed to when she signed the restrictive covenants is not credible, given her statement to Cohn that she would never go back to work for Impact. Wright had the opportunity to ask what the covenants meant, either at the time of her discussion with Cohn, or before she signed them. The covenants at issue here are clear on their face and were entered into knowingly and of Wright's free will.

The covenants at issue are ancillary to the taking of employment. Wright's argument that they were not ancillary because of a ten-day lapse between beginning employment and signing the covenants is not persuasive. Wright agreed to the non-compete covenant prior to accepting employment and signed an agreement expressly referring to the covenants when she first started employment. Such a short period of time is not sufficient to render the covenants unenforceable. *See Beneficial Fin. Co. v. Becker*, 222 A.2d at 876 (contract signed two days after employee commenced work); *Nagaraj v. Arcilla*, 20 D. & C.3d 574, 582–83 (Pa.Com.Pl. 1981) (two weeks). Furthermore, ASI did not ratify Wright's employment agreement until after she had signed the covenants; from ASI's point of view, Wright had not yet consummated her employment. Because the restrictive covenants were part of the forma-

tion of the employment relationship, they are supported by adequate consideration as a matter of law. *Barb–Lee Mobile Frame Co. v. Hoot,* 416 Pa. 222, 225, 206 A.2d 59, 61 (1965).

Defendant Wright bears the burden of showing that the covenants are unreasonable in temporal or geographical scope. *Admiral Services, Inc. v. Drebit,* 1995 WL 134812, *6 (E.D.Pa. Mar.28, 1995); *John G. Bryant Co. v. Sling Testing & Repair, Inc.,* 471 Pa. 1, 369 A.2d 1164, 1169 (1977).[4] Plaintiff seeks to enjoin Wright from working for Impact in any capacity for a one year period. Pennsylvania courts routinely uphold one year restrictive covenants. *See, e.g., Diversey Lever, Inc. v. Hammond,* 1997 WL 28711, *1, *23 (E.D.Pa. Jan.24, 1997) (upholding employer's one year covenant not to compete); *Worldwide Auditing Services, Inc. v. Richter,* 402 Pa.Super. 584, 591–92, 587 A.2d 772, 776 (1991) (upholding employer's two year covenant not to compete). Furthermore, Wright participated in quarterly Internet management meetings where ASI's long-range technical and marketing plans were discussed. A one-year term, although admittedly a long time in this industry, seems necessary to protect ASI's confidential information. Similarly, the geographic scope of the restrictive covenant is reasonable. Although nationwide covenants are disfavored, in this case both ASI and Impact are nationwide businesses, and Wright, while employed by ASI, had extensive contacts with customers all over the nation. *See Graphic Management Assocs.,* 1998 WL 159035, at *14 (upholding covenant restricting defendant from competing with plaintiff in North America); *Volunteer Firemen's Insurance Services, Inc. v. CIGNA Property and Casualty Insurance Agency,* 693 A.2d 1330 (Pa.Super.1997) (upholding nationwide noncompete agreement). Transactions involving the Internet, unlike traditional "sales territory" cases, are not limited by state boundaries. *See Kramer v. Robec, Inc.,* 824 F.Supp. 508, 512 (E.D.Pa.1992) (nationwide bar on competition reasonable "because Robec and its competitors market their products in all fifty states"). The temporal and geographical scope of the covenants at issue here are reasonable.

Finally, ASI seeks to protect its customer goodwill and its business information, both of which courts have recognized as legitimate business interests. *See, e.g., Thermo-Guard,* 596 A.2d at 193–94 ("Pennsylvania cases have recognized that trade secrets of an employer, customer goodwill, and specialized training and skills acquired from the employer are all legitimate interests protectable through a restrictive covenant"). Wright had wide-ranging contact with ASI's customers and potential customers over a significant period of time. Wright was introduced to the Internet through her work with ASI, and became an industry spokesperson on Internet products while at ASI. Wright had access to confidential information regarding ASI's customers, products, technical details, and marketing strategies, both present and future.

Wright's proposed work for Impact would violate the noncompete agreement. If Wright were to work as Vice–President of Internet Services for Impact, she would be marketing and developing Impact products in direct competition with the ASI products she marketed, and she would be selling to the exact same customers that she dealt with at ASI. It is virtually inconceivable that Wright would be able to avoid utilizing the confidential information she learned at ASI and exploiting ASI's customer goodwill. Even if Wright did not have direct contact with customers, Impact could publicize its employment of Wright in order to capitalize on ASI's goodwill.

No evidence was produced at the hearing that there is *any* job at Impact that Wright could perform without endangering ASI's legitimate business interests in protecting its goodwill and information. The jobs proposed by Peter Klein all entail extensive customer contact on Internet issues (Klein, pp. 244–45, l.22) exactly what ASI bargained to prevent. Wright argues that she could work for Impact without violating the agreement, by limiting her customer contacts and resolutely

4. Pennsylvania law governs this diversity case, and, therefore, determines the parties' burdens of proof on the enforceability of the employment covenants.

refusing to make use of ASI's confidential information. I do not doubt Wright's good intentions; however, it would be impossible for Wright to work for Impact without making use of her goodwill and information: Wright's every decision would be informed by the information she acquired at ASI. The one-year non-compete and non-disclosure provisions are reasonably necessary to protect the legitimate business interests of ASI in protecting its customer goodwill and its confidential and proprietary business information. Any narrowing of these provisions, whether in temporal scope or employment function, would irreparably harm ASI.

ASI has proven that without an injunction Wright will break the restrictive covenants by working for Impact as the Vice–President of their Internet Services Division. ASI has shown that the covenants were ancillary to Wright's employment, were supported by adequate consideration, are reasonably limited in time and geographic scope, and that the covenants are reasonably necessary to protect ASI's legitimate business interests. ASI has succeeded on the merits.

### B. Irreparable Harm to Plaintiff

Harm is irreparable when it cannot be adequately compensated in damages, either because of the nature of the right that is injured, or because there exists no certain pecuniary standards for the measurement of damages. *Albert E. Price, Inc. v. Metzner*, 574 F.Supp. 281, 289 (E.D.Pa.1983). ASI will suffer substantial injury if Wright goes to work for Impact. Wright developed extensive customer relationships while employed by ASI, which constitute the goodwill of ASI. Wright also has a wide-ranging knowledge of ASI's business, products and customers, which would be impossible for her not to call on if she was working for ASI's direct competitor. As an employee of Impact, Wright's duties will certainly be in conflict with ASI's objectives, which are to sell its products and services and promote its goodwill. The potential injury to ASI's goodwill and the po-

tential use of ASI's confidential information constitutes irreparable harm. *See id.*

### C. Greater Harm to Defendant

Granting the permanent injunction, and thereby enforcing the covenants, will not result in even greater harm to Wright than denying it would to ASI. Wright is not only indemnified by Impact for any harm, but also appears well-qualified to find employment with a non-competitor of ASI, certainly for a year's time. Wright's numerous contacts in the industry make it likely that she could find employment rapidly. Wright might not be able to obtain a position as rewarding, in either monetary or career terms, as the one at Impact; however, Wright does not have a right to the ideal job, but rather, to be able to earn a livelihood. *See e.g., Graphic Management Assocs.*, 1998 WL 159035, at *18 (finding defendant will not be irreparably harmed, where he could work outside of North America, or work for non-competitor of former employer). Furthermore, ASI has offered repeatedly to employ Wright at a related business. Wright voluntarily left ASI, with full knowledge that ASI would enforce the covenants against her; this factor is worth considering in balancing the harms to the parties.[5] *See, e.g., Surgical Sales Corp. v. Paugh*, 1992 WL 70415, *10 n. 6 (E.D.Pa. March 31, 1992). Wright has no lack of opportunities. Wright has not chosen, up to this point, to pursue opportunities outside of Impact.

### D. The Public Interest

The public interest is best served, in this case, by upholding the restrictive covenants freely entered into by Wright. Granting a permanent injunction to ASI "will discourage unfair competition, the misappropriation and wrongful use of confidential information and trade secrets and the disavowal of freely contracted obligations." *Graphic Management Assocs., Inc. v. Hatt*, 1998 WL 159035, at *19.

---

5. Note that Wright also expressly agreed, as part of the "Agreement" containing the non-compete and non-disclosure covenants, that, were she to breach the "Agreement," ASI would be irreparably harmed and entitled to injunctive relief. (Ex. P–1, ¶ 2.5). Although Wright's agreeing to injunctive relief at the formation of her employment is not determinative of the enforceability of the covenants, it does indicate Wright's awareness of the potential consequences of any breach, and, therefore, weighs into the balance of equities.

## III. Conclusions of Law

Consistent with the above findings of fact and discussion, I make the following conclusions of law:

1. I have subject matter jurisdiction over this action, because there is diversity of citizenship between the parties and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332(a).

2. Pennsylvania law governs this action. Ex. P–1, § 3.4.

3. I must consider four factors when determining whether to issue a permanent injunction: (1) the moving party has shown actual success on the merits; (2) the moving party will be irreparably harmed by the denial of injunctive relief; (3) the granting of the permanent injunction will result in even greater harm to the defendant; and (4) the injunction would be in the public interest. *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Ed.*, 84 F.3d 1471, 1477 nn. 2–3 (3d Cir.1996).

4. Plaintiff has succeeded on the merits of its case.

5. Plaintiff has shown that the restrictive covenants signed by defendant in August 1995 are ancillary to the defendant's employment, supported by adequate consideration, reasonable in time and geographic scope, and reasonably necessary to protect the plaintiff's business interests.

6. Plaintiff has shown that it will be irreparably harmed absent the grant of a permanent injunction.

7. Defendant has not shown that she will suffer a greater harm if a permanent injunction is granted.

8. ASI is entitled to the permanent injunction it seeks.

### ORDER

**AND NOW,** this day of April 1998, upon consideration of all the evidence before me, **IT IS ORDERED** that the Standstill Agreement entered into by the parties on March 31, 1998 is vacated; judgment is entered in favor of the plaintiff; and defendant Wright is enjoined from:

(1) working for Impact for one year from the effective date of Wright's resignation from ASI (April 1, 1999);

(2) using, disclosing, or revealing any confidential information belonging to ASI;

(3) destroying or copying any information taken from ASI; and

(4) retaining any property of ASI.