IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT
**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| RULLEX CO., LLC, INCORRECTLY DESIGNATED AS RULLEX, INC., | : | No. 27 EAP 2019 |
| | : | |
| | : | Appeal from the Order of the Superior |
| Appellant | : | Court entered on 1/11/19 at No. 1171 |
| | : | EDA 2018 (reargument denied 2/19/19) |
| | : | affirming the order entered on 4/5/18 in |
| v. | : | the Court of Common Pleas, |
| | : | Philadelphia County, Civil Division at |
| | : | No. 180200961 |
| TEL-STREAM, INC. AND YURI KARNEI, | : | |
| | : | |
| Appellees | : | ARGUED:  March 11, 2020 |

***OPINION***

**CHIEF JUSTICE SAYLOR**                                    **DECIDED:  June 16, 2020**

In this appeal by allowance, a covenant not to compete was executed by an employee after the first day of employment.  We address whether the employer can enforce that provision in the post-employment timeframe although no new consideration was supplied in connection with its execution.

Appellant Rullex Company performs contracting work for telecommunications businesses such as AT&T, Verizon, and Ericsson, as well as several smaller concerns. The work includes installing, repairing, and maintaining equipment on cellular towers and at cellular base sites.  Individuals who complete such tasks must undergo training in terms of both the equipment involved and occupational safety.

Rullex often subcontracts its cell-tower work to entities such as Appellee Tel-Stream, Inc., founded and operated by Appellee Yuri Karnei.  Although Tel-Stream at

times employed other individuals, for present purposes Tel-Stream was, in effect, Karnei's alter-ego. As such, and for ease of discussion, we will refer only to Karnei and his actions as are relevant to this dispute. Karnei, as well as Rullex's two owners – Aliaasi Aliakhnovich and Ruselon Razhko – are all from Belarus and they ordinarily converse with each other in Russian. They speak and read English as a foreign language with varying degrees of fluency.

In connection with his work for Rullex, Karnei executed two agreements, both facially dated February 5, 2016. The first was a master service agreement (the "MSA") describing the services Karnei would perform for Rullex. The second was a non-disclosure, non-competition agreement, which included provisions stating that: (a) Karnei would not disclose confidential Rullex information such as trade secrets, client lists, and training techniques; and (b) after working for Rullex, Karnei would not compete with Rullex for 24 months within a radius of 200 miles. Only the second agreement is at issue in this appeal – and only its non-competition facet, as discussed below. *See infra* note 2. Thus, we will refer to it as the non-compete agreement, or the "NCA."

Karnei performed subcontract work for Rullex from early 2016 through mid-2017. Thereafter, in late 2017, Karnei began subcontracting his services to a company called Invertice, Inc., which competes with Rullex as a general contractor for wireless communications providers.

In early 2018, Rullex commenced the present action by filing a complaint in the common pleas court alleging that Karnei's work for Invertice violated the terms of the NCA. Rullex asserted that Karnei became acquainted with Invertice and its business when he was employed by Rullex – which, in turn, performed contract work for Invertice through May 2017 notwithstanding that the two companies are competitors. Rullex averred that, after Karnei stopped working for Rullex, he used information about

Invertice that he had learned while working for Rullex, along with the goodwill Rullex had built up with Invertice, to secure subcontracting work from Invertice to the detriment of Rullex. Rullex requested that the court enforce the NCA and award compensatory and punitive damages. The day after it filed its complaint, Rullex filed a motion for a preliminary injunction to prevent Karnei from continuing to work for Invertice while the litigation proceeded. The common pleas court held a hearing on the motion, at which Aliakhnovich and Karnei each testified to their versions of the events surrounding Karnei's being hired by Rullex and executing the two agreements mentioned above, that is, the MSA and the NCA.

Preliminarily, Aliakhnovich stated that Rullex provides training for the employees and subcontractors it hires to complete field work (*i.e.*, work on the equipment, base sites, and towers), and he estimated that the training period lasts twelve months. *See* N.T., Feb. 27, 2018, at 10. Although the parties differed as to when in 2016 Karnei began working for Rullex, as well as the date on which he physically executed the agreements, both witnesses related that Karnei signed them some time after February 5, 2016, the date which appears next to Karnei's signature. Aliakhnovich testified that Karnei started working for Rullex on February 5, 2016, and that Karnei was given the NCA at that time to look over. According to Aliakhnovich, his business partner, Razhko, explained the NCA's provisions to Karnei in Russian, *see id.* at 60-61, and he (Aliakhnovich) permitted Karnei's delay in signing it so that Karnei could ensure he was comfortable with its terms. Aliakhnovich added that Karnei returned to Rullex's offices approximately two months after the February 5, 2016, employment start date and signed the NCA with no requested changes. *See id.* at 57-59.

For his part, Karnei testified that he does not understand written English well, and confirmed that he signed the two agreements after Razhko explained them to him page

by page in Russian. *See id.* at 89-90. However, his testimony concerning the timing of events relating to the NCA diverged from that of Aliakhnovich. Specifically, Karnei stated that Razhko sent the NCA to him electronically through a "Dropbox" system in December 2016, and that he did not actually sign them until February 2017. *See id.* at 87. He separately expressed that he did not work for Invertice while subcontracting for Rullex, and that, per his understanding of the NCA, after he finished working for Rullex he was free to work for Invertice so long as Rullex was not working for Invertice at the time. *See id.* at 93. Karnei testified, further, that, in January 2018 he had occasion to visit Aliakhnovich and Razhko in Rullex's offices, where he mentioned to them that he was working for Invertice. *See id.* at 93-94.

The common pleas court issued an order dated April 5, 2018, denying Rullex's motion for a preliminary injunction. In an accompanying opinion, the court focused on the question of whether Rullex was likely to succeed on the merits – one of the six prerequisites to preliminary injunctive relief. *See Weeks v. DHS*, ___ Pa. ___, ___, 222 A.3d 722, 726 (2019) (discussing these requirements). In answering that question, the court observed that, to be enforceable, a non-competition agreement must, *inter alia*, be supported by adequate consideration. *See Rullex, Inc. v. Tel-Stream, Inc.*, Civil Action No. 180200961, *slip op.* at 6 (C.P. Phila. Apr. 5, 2018) (citing *Insulation Corp. of Am. v. Brobston*, 446 Pa. Super. 520, 528, 667 A.2d 729, 733 (1995)). It noted that a position of employment can comprise such consideration where the non-compete agreement is executed at the inception of the employment relationship. Here, however, the court explained it was undisputed that physical execution of the covenant took place after the first day of work – meaning that additional consideration was needed to render it

enforceable.[1]  The court noted that Rullex did not adduce evidence that it had furnished Karnei with consideration specifically connected with the NCA's execution.  As such, the court held that Rullex failed to establish a likelihood of success on the merits.  *See id.* at 6-7.[2]

A three-judge panel of the Superior Court affirmed in a memorandum opinion. *See Rullex Co., LLC v. Tel-Stream, Inc.*, No. 1171 EDA 2018, 2019 WL 168285 (Pa. Super. Jan. 11, 2019).[3]  The panel explained, initially, that "consideration is crucial" to a restrictive covenant's enforceability, "whether the covenant is entered into prior to, during, or after employment ends."  *Id.* at \*4 (citing *Capital Bakers, Inc. v. Townsend*, 426 Pa. 188, 190-91, 231 A.2d 292, 293-94 (1967) (finding unenforceable for lack of consideration a non-competition agreement executed twelve years after the start of employment)).  It agreed with the common pleas court that, if a restrictive covenant is executed at the inception of the employment relationship, the position itself can

---

[1] The common pleas court's opinion incorrectly states that Karnei started working for Rullex about two months "after" he signed the agreement.  *See id.* at 7.  It later issued an order correcting the opinion so that it says "before."

[2] The court added that there was no evidence Karnei possessed any of Rullex's trade secrets.  To the extent the identities of Rullex's customers was a trade secret, the court pointed out that Aliakhnovich had listed Rullex's customers during his testimony and Rullex did not ask the court to protect that information as confidential.  *See id.* at 8. These points are largely tangential to Rullex's motion and its supporting testimony, both of which center on the non-compete aspect of the agreement, and the contention that Karnei went to work for Invertice within 24 months of working for Rullex.

[3] After Rullex's request for an injunction was denied, it began referring to itself in the caption of its court filings as "Rullex Co., LLC, incorrectly designated as Rullex, Inc." Such practice appears to have stemmed from a discrepancy between the pleadings and the exhibits:  the complaint and motion list the plaintiff's name as "Rullex, Inc.," whereas the employer as reflected on the MSA and NCA is "Rullex Co., LLC."  As Rullex has now clarified, through its new captioning, that its name was originally misstated, we do not consider this minor inconsistency as having any substantive relevance.

constitute adequate consideration. *See id.* at *4 (citing, *inter alia*, *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 630, 136 A.2d 838, 845 (1957)).

The Superior Court panel noted, as well, that a restrictive covenant need not be included in the initial employment agreement, particularly as the restriction may only be relevant after the employee "has developed a certain expertise, which could possibly injure the employer if unleashed competitively[.]" *Id.* at *5 (quoting *Jacobson & Co. v. Int'l Env't Corp.*, 427 Pa. 439, 450, 235 A.2d 612, 618 (1967)). However – and most germane to this appeal – the intermediate court, like the common pleas court, held that any such covenant executed after the first day of employment can only be enforced if accompanied by fresh consideration; it added that such may arise from a favorable change in employment conditions, such as a promotion, a change from part-time to full-time status, or an increase in benefits. *See id.* By contrast, the court indicated, the "mere continuation of the employment relationship at the time of entering into the restrictive covenant is insufficient[.]" *Id.*

Applying these principles, the intermediate court concluded:

> It is not disputed that [Karnei's] work commenced before the parties executed the written contract upon which [Rullex] now relies. [Rullex's] own witnesses confirm that, while the parties discussed many terms at the inception of their relationship and before [Karnei's] work commenced, these discussions formed part of ongoing negotiations and were subject to amendment and alteration. . . . Thus, since the [NCA] upon which [Rullex] relies was executed **after** [Karnei] commenced work, the trial court correctly determined that new and valuable consideration, beyond mere continued work, was needed to support [it].

*Id.* (bolding in original, citation and footnote omitted).

This Court allowed further appeal primarily to assess the validity of the *per se* rule applied by the Superior Court whereby any time a restrictive covenant is executed after the first day of employment, it must be accompanied by fresh consideration. We

also agreed to consider whether that tribunal's description, that the NCA was subject to "discussions [which] formed part of ongoing negotiations" at the time Karnei began work, reflects an improper *sua sponte* factual finding from the appellate level. *See Rullex Co., LLC v. Tel-Stream, Inc.*, ___ Pa. ___, 217 A.3d 805 (2019) (*per curiam*).

Restrictive covenants are generally disfavored in Pennsylvania as they constitute a restraint on trade that also undercuts a former employee's ability to earn a living. *See Hess v. Gebhard & Co.*, 570 Pa. 148, 157, 808 A.2d 912, 916 (2002) (citing *Jacobson & Co. v. Int'l Env't Corp.*, 427 Pa. 439, 235 A.2d 612 (1967)). That principle is tempered to some degree by the recognition that, in the modern business environment, such covenants can be "important business tools" which prevent individuals from "'learning [employers'] trade secrets, befriending their customers and then moving into competition with them.'" *Id.* at 159, 808 A.2d at 918 (quoting *Miller Mechanical, Inc. v. Ruth*, 300 So. 2d 11, 12 (Fla. 1974)).

To be enforceable, a restrictive covenant must be incident to an employment relationship between the parties and supported by consideration; also, its restrictions must be reasonably necessary for the protection of the employer's legitimate interests and reasonably limited in duration and geographic extent. *See id.* at 157, 808 A.2d at 917; *Socko v. Mid-Atl. Sys. of CPA, Inc.*, 633 Pa. 555, 569, 126 A.3d 1266, 1274 (2015); *Piercing Pagoda, Inc. v. Hoffner*, 465 Pa. 500, 506-07, 351 A.2d 207, 210 (1976). Insofar as equitable relief is concerned, this Court applies a deferential standard when considering a common pleas court's ruling on a request for a preliminary injunction: we review the court's ruling for an abuse of discretion, "and will affirm the denial of preliminary relief if the trial court had any apparently reasonable grounds for its action." *Weeks*, ___ Pa. at ___, 222 A.3d at 727 (citing *Marcellus Shale Coal. v. Dep't of Envtl. Prot.*, 646 Pa. 482, 500, 185 A.3d 985, 995 (2018)). "Such grounds exist when

the court properly found that any one of the prerequisites was not satisfied." *Id.* (citing *Warehime v. Warehime*, 580 Pa. 201, 209, 860 A.2d 41, 46 (2004)).

In assessing whether the common pleas court acted properly, we review its factual findings deferentially while resolving issues of law *de novo.* *See Reading Area Water Auth. v. Schuylkill River Greenway Ass'n*, 627 Pa. 357, 365, 100 A.3d 572, 577 (2014). In this latter regard, we will interfere with the court's decision only where "the rule of law relied upon was palpably erroneous or misapplied[.]" *Brayman Constr. Corp. v. PennDOT*, 608 Pa. 584, 602, 13 A.3d 925, 936 (2011) (quoting *Roberts v. Bd. of Dirs. of Sch. Dist. of Scranton*, 462 Pa. 464, 469, 341 A.2d 475, 478 (1975)).

As noted, the common pleas court only considered the likelihood-of-success factor, and denied relief when it concluded that that element was not satisfied. *See generally Allegheny Cty. v. Commonwealth*, 518 Pa. 556, 560, 544 A.2d 1305, 1307 (1988) (indicating that if a litigant fails to establish any one of the multiple prerequisites for a preliminary injunction, the others need not be addressed). As such, that is the only portion of the preliminary-injunction test we will evaluate in the present appeal.

Rullex argues two main points, consistent with the issues accepted for review. First, it asserts that the Superior Court overlooked that the enforceability of a restrictive covenant does not depend on whether it was executed on or before the first day of employment, but rather, on whether it was part of (or ancillary to) "the taking of employment," as opposed to being "foisted on an unsuspecting employee [as an] afterthought." Brief for Appellant at 19, 21, 24. Observing that "events often move faster than paper," *id.* at 22, Rullex references prior decisions in which, according to Rullex, an agreement contemplated at the inception of the employment relationship was held to be enforceable although it was executed after the first day of employment with no additional consideration. *See id.* at 19, 23-29.

Second, Rullex argues that the common pleas court made no findings as to whether the NCA that was actually executed was contemplated in its essential form at the commencement of the employment relationship – and hence, that the Superior Court should not have predicated its decision on the concept that the NCA was subject to ongoing negotiation at that time. Rullex maintains that such a factual determination lies within the sole province of the common pleas court which heard the evidence first-hand. *See id.* at 29-32. It adds that any focus on the question of ongoing negotiations is misplaced in any event as it would be more pertinent to consider the intent of the parties at the time employment commenced.[4] In all events, Rullex continues, reaching any finding concerning such intent would also have been solely for the common pleas court, particularly as there was conflicting testimony on that point. *See id.* at 32-33.[5]

Some of these observations are well taken. For example, we appreciate that in the business world, events can "move faster than paper," as Rullex puts it. As a consequence, a restrictive covenant such as a non-compete agreement, understood by the parties at the outset of the employment relationship as being part of their overall arrangement, might not be physically executed on the first day of work. Consequently, and in view of the Superior Court's *per se* rule, Rullex highlights that Pennsylvania courts have, at times, found a covenant executed after the first day of work enforceable even absent new consideration.

---

[4] Although not entirely clear, Rullex appears to argue that an evaluation of the parties' intent is crucial to distinguishing between a restrictive covenant which is ancillary to the taking of employment – and thus enforceable absent new consideration – and one which is imposed on an employee at a later time.

[5] Rullex additionally suggests that any question concerning whether the NCA was subject to ongoing negotiation was waived by Karnei on appeal to the Superior Court. *See id.* at 33-35. As the appellee, however, Karnei did not bear the burden of issue preservation. *See, e.g.*, *Heim v. MCARE Fund*, 611 Pa. 1, 10, 23 A.3d 506, 511 (2011).

Thus, in *Beneficial Finance Co. of Lebanon v. Becker*, 422 Pa. 531, 222 A.2d 873 (1966), this Court determined that a restrictive covenant was ancillary to the taking of employment (and thus enforceable) where it was contemplated at the inception of the employment relationship, signed on the third day of work, and accepted by the parent company on the twelfth day of work. *See id*. at 536, 222 A.2d at 876 (expressing that any construction of "ancillary" which excluded such circumstances would be "far too narrow"). The *Beneficial Finance* Court did not apply a bright-line rule, but predicated enforceability on the covenant being "an auxiliary part of the taking of regular employment," as opposed to "an after-thought to impose additional restrictions on the unsuspecting employee[.]" *Id*.; *see also Nat'l Bus. Servs., Inc. v. Wright*, 2 F. Supp. 2d 701, 707 (E.D. Pa. 1998) (finding a non-compete agreement enforceable where it was contemplated by the parties before employment began and the employee signed it on the tenth day of work). Conversely, a restrictive covenant executed on the first day of work may, in some circumstances, be unenforceable if the parties had previously reached a binding oral employment contract that did not subsume the restriction. *See George W. Kistler, Inc. v. O'Brien*, 464 Pa. 475, 484, 347 A.2d 311, 316 (1975) (plurality).[6]

---

[6] In *Kistler*, three Justices assessed enforceability in terms of the need for additional consideration. Two concurring Justices expressed that the question of adequate consideration, in substance, spoke to whether the restrictive covenant was ancillary to the taking of employment. *See id*. at 486, 347 A.2d at 316-17 (Roberts, J., joined by Jones, C.J., concurring).

We note that courts may be particularly reluctant to enforce such a covenant if, based upon a prior oral agreement which did not subsume the covenant, the employee has changed his position to his detriment. *See, e.g.*, *PEMCO Corp. v. Rose*, 257 S.E.2d 885, 888-90 (W. Va. 1979) (finding unenforceable a non-compete agreement executed on the first day of employment where the employee had relocated and contracted to purchase a home based on a prior oral agreement between the parties which did not contemplate the non-compete provision).

This approach comports with sound reasoning as it gives effect to the parties' intentions. By contrast, a bright-line rule such as that utilized by the Superior Court could subvert the expectations of parties who fully anticipate and intend the restriction to be ancillary to the taking of employment, but the employee, for whatever reason, signs the covenant shortly after the first day. Alternatively, such an approach might unnecessarily delay an employee's ability to begin earning income if he or she is not in a position to sign the agreement until a reasonably short period after work begins. *Accord* Brief for Appellant at 28-29.

Hence, the test for whether new consideration is required has not ordinarily centered on whether the employee physically executed the agreement precisely on (or before) the first day of employment. Rather, and as explained, restrictive covenants have been deemed enforceable absent fresh consideration in situations where the parties contemplated and intended that, incident to the employment relationship, the employee would be bound by its substantive terms – and the employee ultimately signed it shortly after the first day.

This is in contrast with circumstances where a non-compete agreement is imposed on an employee essentially as a belated addition to the employment relationship. *See generally* Jordan Leibman & Richard Nathan, *The Enforceability of Post-Employment Noncompetition Agreements Formed After At-Will Employment Has Commenced: The "Afterthought" Agreement*, 60 S. CAL. L.REV. 1465, 1472 (1987) (referring to these as "afterthought agreements"). In *Maintenance Specialties, Inc. v. Gottus*, 455 Pa. 327, 314 A.2d 279 (1974), for example, this Court found a non-compete clause unenforceable where it was not in the original, oral employment contract, but appeared when the contract was reduced to writing the next year and was unsupported by new consideration. *See id.* at 330, 314 A.2d at 281.

From the foregoing it should be evident that, for a restrictive covenant executed after the first day of employment to be enforceable absent new consideration, the parties must have agreed to its essential provisions as of the beginning of the employment relationship. Only in that circumstance will the covenant in substance be "ancillary to taking employment[.]" *Pulse Techs., Inc. v. Notaro*, 620 Pa. 322, 327, 67 A.3d 778, 781 (2013) (quoting *Beneficial Finance*, 422 Pa. at 534, 222 A.2d at 875). In this respect, Karnei argues that, as with other types of agreements,

> there must be a meeting of the minds on the terms of [the] restrictive covenant. Thus, before preliminary negotiations ripen into contractual obligations, there must be evidence of mutual assent to the terms of a bargain. If "the parties themselves contemplate that their agreement cannot be considered complete, and its terms assented to, before it is reduced to writing, no contract exists until the execution of the writing."

Brief for Appellee at 24 (citing and quoting *Essner v. Shoemaker*, 393 Pa. 422, 425, 143 A.2d 364, 366 (1958)).

In making an assessment along these lines, it may not be necessary to prove an actual, subjective "meeting of the minds," as objective manifestations of assent and/or an intent to be bound by the covenant's substance can suffice. *Accord Commonwealth v. Burno*, 648 Pa. 228, 232, 192 A.3d 74, 76 (2018) (*per curiam*) (Wecht, J., concurring) (citing, *inter alia*, *Liss & Marion, P.C. v. Recordex Acquisition Corp.*, 603 Pa. 198, 210, 983 A.2d 652, 659 (2009) (holding that the intention to enter into a contract may be inferred "from acts in the light of the surrounding circumstances"), and *Rambo v. Greene*, 906 A.2d 1232, 1236 (Pa. Super. 2006) (holding that "objective manifestations" may establish an intent to be bound absent a formal "meeting of minds")).[7]

---

[7] We emphasize "substance" because it would elevate form over substance if minor adjustments made after the beginning of work – *i.e.*, adjustments which do not alter the parties' rights and obligations under the agreement – could vitiate its enforceability.

As we view the record, there is no evidence suggesting that, as of the commencement of the employment relationship, there was a meeting of the minds as to the NCA, or that Karnei otherwise manifested his assent to provisions of the NCA that Rullex gave him or an intent to be bound by them. Rullex nonetheless maintains that the common pleas court's findings of fact are so limited that they do not state this specifically, nor do they purport to resolve the parties' conflicting testimony on the question of when Karnei received the written restrictive covenant in relation to the commencement of his employment, or the date on which he understood and assented to its terms. *See* Reply Brief for Appellant at 1-3. Rullex also maintains, in this regard, that a right-for-any-reason disposition was not available to the Superior Court on the present record because that principle does not pertain where a factual dispute must be resolved before the underlying legal issue can be decided. *See id.* at 5 (citing cases).

Rullex is correct that the common pleas court did not undertake to resolve the parties' conflicting testimony or make credibility determinations relative to that testimony. Nor did it specifically find that the NCA was the subject of ongoing negotiations between the parties while work proceeded. It did find, however, that under either party's version of the events, Karnei started working for Rullex at least two months before the NCA was executed. *See supra* note 1 and related text. That being the case, and pursuant to the explanation given above, the only way the NCA could have been enforceable is if the parties had nonetheless agreed to its substantive terms at the outset of Karnei's employment. As Rullex was the movant, it was Rullex's obligation to provide evidence along these lines so as to carry its burden to demonstrate a likelihood of success on the merits. Rullex's sole witness, however, testified as follows:

> The first time Yuri [Karnei] came to our office, my partner, Russell [Razhko], explained everything in the contract. Then we just give the

contract to Yuri with the words, Yuri, you can take a look at the contract, you can translate it, you can work with lawyers. If you not agree with something, you could tell us and we can change that before we are signing. So, we are not just signing the contract, no. Take the contract to the home, take a look, read it carefully, and then get back to me. If you not agree with something, we are going to change that. If you agree with everything, we are going to sign the contract . . ..

N.T., Feb. 27, 2018, at 56-57.

The clear purport of this testimony is that Rullex was, perhaps laudably, willing to give Karnei some time to understand and think about the substance of the NCA, and to accommodate any difficulties he might have agreeing to its terms. Although this shows the NCA was not in the nature of an "afterthought agreement," the logical corollary nonetheless is that Rullex did not view itself and Karnei, as of the time Karnei started work, as having already converged as to the specific rights and obligations to be imposed on the parties under the NCA. And this is true even though the NCA, as it was ultimately executed, may have been identical to the draft which was initially given to Karnei.

Even if the above testimony is disbelieved, moreover, Rullex fails to point to any other aspect of the record indicating that the parties had reached a meeting of the minds or otherwise manifested an intent to be bound by the NCA as it existed when Karnei started work, and our independent review does not reveal any. We find, then, that the common pleas court had "apparently reasonable grounds" to conclude that Rullex failed, at that early stage of the litigation, to demonstrate a likelihood of success on the merits. Accordingly, that court acted properly in denying the motion for a preliminary injunction.

The second issue before us, as noted, relates to whether the Superior Court exceeded its scope of appellate review by finding, *sua sponte,* that the NCA was the subject of ongoing negotiation between the parties. In light of the above determination,

any alleged error of that nature on the part of the intermediate court is immaterial to the resolution of this appeal.  Thus, we do not address it.

The order of the Superior Court is affirmed.


Justices Baer, Todd, Donohue, Dougherty, Wecht and Mundy join the opinion.