**QUAKER CHEMICAL CORPORATION,**
**Plaintiff,**

v.

**Charles VARGA, Defendant.**

**Civil Action No. 07–2668.**

United States District Court, E.D. Pennsylvania.

Sept. 4, 2007.

Ronald J. Shaffer, Theodore H. Jobes, Fox Rothschild O'Brien & Frankel, LLP, Philadelphia, PA, for Plaintiff.

Chad W. Moeller, David B. Ritter, Neal, Gerber & Eisenberg, LLP, Chicago, IL, Mathieu Shapiro, Obermayer, Rebmann, Maxwell & Hippel, LLP, Philadelphia, PA, for Defendant.

## MEMORANDUM

EDUARDO C. ROBRENO, District Judge.

Quaker Chemical Corporation moves to enjoin Charles Varga, a former Quaker employee, from commencing employment with D.A. Stuart, Inc., a Quaker competitor, for a period of one year, consistent

with the covenant not to compete that Varga executed upon commencing employment with Quaker. Quaker also moves to enjoin Varga from disclosing confidential or trade secret information Varga acquired in the course of his employment with Quaker, consistent with the covenant not to disclose that Varga executed upon commencing employment with Quaker.[1]

After an expedited discovery schedule,[2] the Court held a day-long hearing on August 9, 2007, at which it heard witnesses and received documentary evidence. Pursuant to Federal Rule of Civil Procedure 52(a), the Court enters the following findings of fact and conclusions of law.

The Court will enter a preliminary injunction barring Varga from commencing employment with Stuart until July 4, 2008, and barring Varga from disclosing any of Quaker's confidential or trade secret information.

## I. FINDINGS OF FACT

The facts of this case are almost entirely undisputed.

### A. *Quaker and Stuart*

Both Quaker and Stuart develop and produce specialty chemical products, in-cluding oils and fluids, for metal and metal-working industries. These industries include steel and aluminum manufacturers. Quaker is headquartered in Pennsylvania; Stuart in Illinois.

Quaker has twenty-seven facilities, in North America, South America, Europe, Asia, Africa, and Australia. Stuart has ten facilities, in North America, South America, Europe, and Asia. In spite of the actual location of the manufacturing plants and offices, Quaker's and Stuart's sales representatives often travel to their customers' physical locations. They compete for many of the same customers.

Each customer is a metal-working or similar factory. Each factory employs specialty chemical products to produce the final steel or aluminum product. Quaker and Stuart work with the customers to develop the chemical products that the customers desire. The chemical formula for each product is different. Quaker and Stuart both market to the customers and generally compete to have each customer use its (Quaker's or Stuart's) products.

In short, both companies agree that they are direct head-to-head competitors.[3]

---

1. Rather than answer the complaint, Varga moved to dismiss on the grounds that the Court lacked personal jurisdiction over Varga. Following a hearing, the Court denied the motion to dismiss and held that it did have personal jurisdiction. Varga however, did not file his answer within ten days of the Court's denial of his motion to dismiss. *See* Fed.R.Civ.P. 12(a)(4)(A). (In fact, Varga has yet to file an answer.) Nevertheless, the Court will construe Varga's arguments in his proposed conclusions of law (doc. no. 28) as his answer and will consider Quaker's claims to be generally denied and the pleadings closed for the purpose of deciding this motion for a preliminary injunction.

2. Suit was filed on June 26, 2007. On July 2, the Court granted Quaker a temporary re-straining order. On July 9, the Court denied Varga's motion to dismiss and entered an expedited discovery schedule, which was in large part completed by the parties.

For the August 9, 2007, preliminary injunction hearing, after consultation with counsel, the Court assigned each side 4 hours to present its respective case and conduct cross-examination. Neither side exhausted the allotted time. At the hearing, Plaintiff offered 41 exhibits and Defendant offered 2, all of which were admitted into evidence. Plaintiff called 4 witnesses and Defendant called 2.

3. According to Quaker, Stuart is one of its four direct competitors, the others being Henkel, Fuchs, and Haughton International.

### B. *Varga's Employment History*

Varga began his employment with Quaker as a chemist in May 1973. After rising to the rank of product manager at Quaker, Varga left Quaker in 1988 to join Stuart as a lab manager. After rising to the rank of director of process technology at Stuart, Varga left Stuart in 2002 to rejoin Quaker as the senior market development manager. Varga was employed by Quaker from 2002 to mid–2007. During this 2002 to 2007 period, Varga worked out of his home in the Chicago area.

Most recently at Quaker, Varga was the global technical manager of steel and fluid power for North and South America. While most of his clients were in the steel industry, he had at least one aluminum client. While at Quaker, he reported to the senior vice president.

### C. *Varga's Proposed Position at Stuart*

Varga was initially offered a position at Stuart as director of marketing, ferrous division, in which he would report to the vice president for the metals division.[4] After some negotiation, the job title was changed to director of market develop-

ment, metals division, and the position reported directly to the president of Stuart.

*After* this suit was commenced, Stuart attempted what might be termed a "work-around." Instead of being the director of market development for the *metals* division (which would include both steel and aluminum), Varga would be the director of market development for the *aluminum* division. Under this reconfigured job description, it is unclear whether there would be a director of market development for the steel division, or if those responsibilities would be assigned elsewhere, or perhaps not completed at all.

### D. *The Restrictive Covenants*

As a condition of commencing employment with Stuart in 1988, Varga signed an employment agreement in which he agreed not to solicit any Stuart customers for a period of eighteen months after leaving Stuart's employ.

As a condition of commencing employment with Quaker in 2002, Varga signed an employment agreement in which he agreed (1) not to disclose any of Quaker's trade secret information[5] and (2) not to

---

**4.** "Ferrous" refers to metals that contain iron. As relevant here, ferrous generally means steel. "Non-ferrous" refers to metals that do not contain iron. As relevant here, non-ferrous generally means aluminum.

**5.** The non-disclosure covenant is contained in paragraph 4 of the agreement:

You acknowledge that the identity of Quaker's (and any of Quaker's affiliates') customers, the requirements of such customers, pricing and payment terms quoted and charged to such customers, the identity of Quaker's suppliers and terms of supply (and the suppliers and related terms of supply of any of Quaker's customers for which management services are being provided), information concerning the method and conduct of Quaker's (and any affiliate's) business such as formulae, formulation information, application technology,

manufacturing information, marketing information, strategic and marketing plans, financial information, financial statements (audited and unaudited), budgets, corporate practices and procedures, research and development efforts, and laboratory test methods and all of Quaker's (and its affiliates') manuals, documents, notes, letters, records, and computer programs are Quaker's trade secrets ("Trade Secrets") and are Quaker's (and/or any of its affiliates', as the case may be) sole and exclusive property. You agree that at no time during or following your employment with Quaker will you appropriate for your own use, divulge or pass on, directly or through any other individual or entity or to any third party, any Quaker Trade Secrets. Upon termination of your employment with Quaker and prior to final payment of all monies due to you under Paragraph 2 or at

compete with Quaker for a period of one year after leaving Quaker's employ.[6] Quaker's non-compete agreement contains no geographic limitation.

In 2007, Varga signed an employment agreement with Stuart, although, per this Court's temporary restraining order, he has not yet begun working at Stuart. In the 2007 employment agreement, Varga agreed (1) not to disclose any of Stuart's confidential information and (2) not to compete with Stuart for a period of one year after leaving Stuart's employ. Stuart's non-compete agreement also contains no geographic limitation.

### E. *Varga's Leaving Quaker in 2007*

Varga and Charles Santangelo, the president and CEO of Stuart, are longtime social friends. In November 2006, during a dinner at which only Varga and Santangelo were present, the topic of Varga's job

> any other time upon Quaker's request, you agree to surrender immediately to Quaker any and all materials in your possession or control which include or contain any Quaker Trade Secrets.

6. The non-compete covenant is contained in paragraph 5 of the agreement:

> In consideration of your employment with Quaker and the training you are to receive from Quaker, you agree that during your employment with Quaker and for a period of one (1) year thereafter, regardless of the reason for your termination, you will not:
> a. directly or indirectly, together or separately or with any third party, whether as an employee, individual proprietor, partner, stockholder, officer, director, or investor, or in a joint venture or any other capacity whatsoever, actively engage in business or assist anyone or any firm in business as a manufacturer, seller, or distributor of chemical specialty products which are the same, like, similar to, or which compete with Quaker (or any of its affiliates') products or services; and
> b. at the Chemical Management Services sites to which you are, have, or will specifically ever be assigned in the future, directly or indirectly, together or separately or with any third party, whether as an employee, individual proprietor, partner, stockholder, officer, director, or investor, or in a joint venture or any other capacity whatsoever, actively engage in business or assist anyone or any firm in business as a provider of chemical management services which are the same, like, similar to, or which compete with Quaker (or any of its affiliates') services; and
> c. recruit or solicit any Quaker employee or otherwise induce such employee to leave Quaker's employ, or to become an employ-

> ee or otherwise be associated with you or any firm, corporation, business, or other entity with which you are or may become associated; and
> d. solicit or induce any of Quaker's suppliers of products and/or services (or a supplier of products and/or services of a customer who is being provided or solicited for the provision of chemical management services by Quaker) to terminate or alter its contractual relationship with Quaker (and/or any such customer).
> The parties consider these restrictions reasonable, including the period of time during which the restrictions are effective. However, if any restriction or the period of time specified should be found to be unreasonable in any court proceeding, then such restriction shall be modified or the period of time shall be shortened as is found to be reasonable so that the foregoing covenant not to compete may be enforced. You agree that in the event of a breach or threatened breach by you of the provisions of the restrictive covenants contained in Paragraph 4 or in this Paragraph 5, Quaker will suffer irreparable harm, and monetary damages may not be an adequate remedy. Therefore, if any breach occurs, or is threatened, in addition to all other remedies available to Quaker, at law or in equity, Quaker shall be entitled as a matter of right to. specific performance of the covenants contained herein by the way of temporary or permanent injunctive relief. In the event of any breach of the restrictive covenant contained in this Paragraph 5, the term of the restrictive covenant shall be extended by a period of time equal to that period beginning on the date such violation commenced and ending when the activities constituting such violation cease.

future at Quaker was broached. At the dinner, Varga did not ask for a job at Stuart, and Santangelo did not offer one. However, Santangelo did ask Varga for a copy of Varga's employment contract with Quaker, for Stuart's use in the event that a position for Varga were to become available at Stuart. Varga sent Santangelo a copy of the contract.

On May 29, 2007, Santangelo called Varga and offered him a job as Stuart's director of marketing. Santangelo asked Varga for a list of Varga's clients at Quaker, ostensibly so that Santangelo could structure Varga's job responsibilities so that Varga would not solicit any customers that he may have dealt with while at Quaker. (Of course, Varga's agreement with Quaker—as Santangelo knew—was a non-compete agreement, not simply a non-solicitation agreement.) On May 30, Varga and Santangelo met for lunch to discuss the job offer. At the lunch, Varga provided the list of customers he had dealt with while at Quaker. In the afternoon following the lunch, Santangelo sent Varga a draft job description.

On June 1, the two met again to discuss the position. Later on June 1, Santangelo sent Varga a revised draft job description. Still later on June 1, Varga orally accepted Santangelo's job offer.

On June 3, Varga signed Stuart's written employment agreement. On June 4, Varga notified Quaker that he was resigning. Varga provided two weeks' notice, but, after being reminded that his Quaker employment contract required thirty days' notice, agreed to continue to be employed by Quaker for thirty days.

Early on June 5, Quaker suspended Varga's online access to Quaker's confidential information. In the early afternoon of that day (June 5), a Quaker human resources employee called Varga to inform him that a Quaker employee would be coming to Varga's house on June 6 to collect Varga's laptop and other Quaker property. Varga did not answer his cell phone or home phone; the Quaker employee left a message. Later that afternoon, the Quaker employee called again, again not reaching him on his cell phone, but this time leaving a message with Varga's wife to have Varga return the call. Varga returned the call about fifteen minutes later, and the call lasted approximately forty minutes.

While Varga was on the phone with the Quaker employee (and/or shortly before or shortly after), Varga copied all documents in the "My Documents" folder on his Quaker-issued laptop to an 8–gigabyte USB storage device that he had purchased earlier that afternoon. All told, he copied 4,496 files, which would occupy over 32,000 printed pages. Varga did not seek permission from Quaker to copy the files, nor did he notify Quaker that he had done so.

On June 6, as planned, a Quaker employee went to Varga's house and collected Varga's laptop and other Quaker materials. (Varga did not turn the USB storage device over to Quaker.) Quaker had the laptop examined by a computer forensic analyst, who informed Quaker that Varga had copied the files.

Quaker filed suit against Varga on June 26. (Note that Varga was technically a Quaker employee until July 4, although he had no responsibilities or even access to any Quaker materials after June 5.) Later in the day on June 26, *after* he had learned that he had been sued, Varga attached the USB storage device to one of his personal computers and proceeded, over the course of a few hours, to delete those files and folders that he believed to be Quaker's confidential property. Varga deleted the files by first "dragging" them to the "recycle bin" and then, when he was finished,

"emptying" the recycle bin. Varga retained on the storage device those files and folders he thought were personal, such as photos, travel itineraries, his son's college loan application, and a file entitled "Canadian humor."

There is no evidence that, after June 26, Varga copied or somehow otherwise retained the confidential Quaker information that was on the storage device.

## II. QUAKER'S COMPLAINT

Quaker is proceeding against Varga on four claims; it alleges that three of those claims provide the authority for this Court to enter a preliminary injunction against Varga.

Count I is for an alleged violation of the Pennsylvania Uniform Trade Secrets Act (PUTSA), which protects trade secrets located in Pennsylvania. The statute provides for injunctive relief for "[a]ctual or threatened" misappropriation of trade secrets. 12 Pa. Cons.Stat. § 5303.

Count II is for an alleged violation of the Federal Computer Fraud and Abuse Act (CFAA), which prohibits, inter alia, "intentional[ ] access[ ][of] a protected computer without authorization." 18 U.S.C. § 1030(a)(5)(A)(iii). The statute provides that "[a]ny person who suffers damage or loss" may obtain "injunctive relief or other equitable relief" against the violator. *Id.* § 1030(g).

Count III is for an alleged breach of contract. Varga's employment contract with Quaker precludes Varga from competing against Quaker for one year and from disclosing Quaker's confidential information. Quaker seeks specific enforcement of this contract against Varga.

Count IV is for an alleged breach of fiduciary duties. Here, Quaker does not allege that a breach of fiduciary duties,

even if true, would provide support for an injunction against Varga.

## III. CONCLUSIONS OF LAW

### A. *The Applicable Law*

For the substance of the state-law claims (PUTSA and breach of contract), the Court is to apply Pennsylvania state substantive law. *See SI Handling Sys., Inc. v. Heisley,* 753 F.2d 1244, 1255 (3d Cir.1985). For the federal CFAA claim, the Court is to apply federal law.

Although two of the relevant claims are state-law claims, this federal court, sitting in diversity, is to apply federal substantive law to a request for a preliminary injunction. *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 799 (3d Cir. 1989).

### B. *Analysis*

There are two distinct issues at play here, the non-compete covenant and potential disclosure of Quaker's confidential information.

Varga argues that there are two reasons why the non-compete covenant does not preclude him from working for Stuart. The first is that the non-compete covenant is unreasonable (and thus unenforceable) because of a lack of geographic restriction. The second is that, even if the non-compete covenant is enforceable, the equities weigh in favor of permitting Varga to work in Stuart's *aluminum* division.

The second issue is Varga's potential disclosure of Quaker's confidential information. Quaker contends that Varga should be prohibited from working at Stuart because he might possess certain of Quaker's confidential information.

### 1. *The Non–Compete Covenant*

#### a. *The Non–Compete Covenant Is Reasonable*

■ Under Pennsylvania law, for a non-compete covenant to be enforceable, (1) it must be "incident to an employment relation between the parties to the covenant," (2) the restrictions must be "reasonably necessary for the protection of the employer," and (3) the restrictions must be "reasonably limited in duration and geographic extent." *Sidco Paper Co. v. Aaron*, 465 Pa. 586, 351 A.2d 250, 252 (1976). The burden is on the employee to demonstrate that the non-compete covenant is "unreasonable[ ]." *John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 369 A.2d 1164, 1169 (1977). This burden is "particularly heavy," as "the determination of reasonableness is a factual one, requiring consideration of all the facts and circumstances." *Victaulic Co. v. Tieman*, 499 F.3d 227, 235 (3d Cir.2007) (quoting *WellSpan Health v. Bayliss*, 869 A.2d 990, 999 (Pa.Super.Ct.2005)).

■ Varga challenges only one aspect of the non-compete covenant, that of its seemingly unlimited geographic extent. Varga argues that the non-compete covenant's lack of a geographic scope renders the covenant unenforceable. Such is not the case.

Courts have upheld non-compete covenants lacking geographic limits (or with very broad geographic restrictions) where the employee's duties and the employer's customers were geographically broad. *See Fisher Bioservices, Inc. v. Bilcare, Inc.*, 2006 WL 1517382, at *13 (E.D.Pa. May 31, 2006) (holding that non-compete lacking geographic restriction was enforceable because the former employer sought only to prevent the employee from soliciting customers she dealt with while at the former employer); *Nextgen Healthcare Info. Sys.,* *Inc. v. Messier*, 2005 WL 3021095, at *13 (E.D.Pa. Nov. 10, 2005) ("Nationwide non-compete restrictions are enforceable under Pennsylvania law where the former employer does business on a nationwide scale."); *Coventry First, LLC v. Ingrassia*, 2005 WL 1625042, at *9 (E.D.Pa. July 11, 2005) (noting that courts uphold nationwide territorial scopes when the employee has actually serviced clients nationwide); *Nat'l Bus. Servs., Inc. v. Wright*, 2 F.Supp.2d 701, 708 (E.D.Pa.1998) ("[T]he geographic scope of the restrictive covenant is reasonable. Although nationwide covenants are disfavored, in this case both [the former employer] and [the new employer] are nationwide businesses, and [the employee], while employed by [the former employer], had extensive contacts with customers all over the nation."); *Graphic Mgmt. Assocs., Inc. v. Hatt*, 1998 WL 159035, at *14 (E.D.Pa. Mar.18, 1998) ("[T]he geographic scope of the restrictive covenant (North America) is reasonable. . . . [The former employer] sells its equipment and consulting services to hundreds of newspapers throughout the United States and Canada. As a [former employer] executive, [the employee's] work involved clients throughout North America."); *QVC, Inc. v. Bozek*, 1996 WL 179993, at *4 (E.D.Pa. Apr. 12, 1996) ("Because [the former employer] and its competitors conduct business via nationally televised cable television, the national geographic scope of the provision is reasonable to protect [the former employer's] interests."); *Kramer v. Robec, Inc.*, 824 F.Supp. 508, 512 (E.D.Pa.1992) ("Because [the former employer] and its competitors market their products in all fifty states, the [nationwide] geographic scope of the restrictive covenant is not unreasonable."). If nationwide geographic scopes are reasonable for national companies, it is not hard to extrapolate that worldwide geo-

graphic scopes are similarly reasonable for worldwide companies.

Moreover, the Third Circuit recently noted that the notion of a too-broad geographic scope has become "antiquated" in light of the increasingly global economy. *Victaulic*, 499 F.3d at 238. "In this Information Age, a *per se* rule against broad geographic restrictions would seem hopelessly antiquated, and, indeed, Pennsylvania courts (and federal district courts applying Pennsylvania law) have found broad geographic restrictions reasonable so long as they are roughly consonant with the scope of the employee's duties." *Id.* Finally, the Third Circuit has counseled that the district court should consider the geographic element in the context of the overall non-compete restriction. *Id.* In *Victaulic*, the covenant "prevent[ed] Tieman from working for nine named competitors—presumably businesses that, like Victaulic, are large-scale suppliers of the same kinds of products. These competitors might be able to use a former Victaulic employee's specialized knowledge of Victaulic's product lines and sales strategies anywhere in the world that the two compete." *Id.* Here, the geographic limitation (or lack thereof) must be read in connection with the overall non-compete covenant. Varga is prohibited from working for a Quaker competitor anywhere in the world. Quaker has only a handful of direct competitors, and these companies, regardless of the physical location of their headquarters, offices, manufacturing plants, or employees, compete for customers on a worldwide basis. Indeed, in the parlance of the Third Circuit, "[t]hese competitors might be able to use a former [Quaker] employee's specialized knowledge of [Quaker's] product lines and sales strategies anywhere in the world that the two compete." *Id.*

This case demonstrates the Third Circuit's point in *Victaulic*. Both Quaker and Stuart admit that they are head-to-head competitors in markets for specialty oils for both steel and aluminum in both the United States and abroad. They have many of the same customers and they compete for many of the same customers. Quaker, headquartered in Pennsylvania, and Stuart, headquartered in Illinois, are worldwide companies with offices and clients on every continent save Antarctica. Moreover, Varga proposes to work for Stuart *in Illinois*. He was working for Quaker for the past five years *in Illinois*. There is simply no dispute that the covenant's restriction on him working for Stuart is reasonable in spite of the covenant's lack of a geographic limitation.

The non-compete covenant is reasonable and enforceable, in spite of its lack of a geographic restriction.

### b. *The Non–Compete Covenant Should Be Enforced at Equity*

This question is the heart of the parties' dispute. Varga argues that, in spite of the non-compete covenant, he should be permitted to work for Stuart in its aluminum division. Quaker argues that the non-compete covenant should prevent Varga from working for Stuart in any capacity.

### i. *Preliminary Injunction Factors*

The Court must "balance" four factors in determining whether to grant a preliminary injunction:

(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*Allegheny Energy, Inc. v. DQE, Inc.*, 171 F.3d 153, 158 (3d Cir.1999) (quoting *Am. Civil Liberties Union of N.J. v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 n. 2 (3d Cir.1996) (en banc)).[7] The granting of a preliminary injunction is an "extraordinary remedy." *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1426 (3d Cir.1994).

(a). *Reasonable Probability of Success*

■ In the non-compete covenant, Varga agreed that, for a period of one year after leaving Quaker, he would not be employed by "any firm in business as a manufacturer, seller, or distributor of chemical specialty products which are the same, like, similar to, or which compete with Quaker (or any of its affiliates') products or services." It is undisputed that Stuart is a seller of specialty chemical products and that Stuart competes directly with Quaker. It is also undisputed that Varga signed an employment agreement with Stuart and seeks to work for Stuart, a competitor.

Quaker thus has a very high probability of succeeding on the merits against Varga for violating the non-compete covenant.

(b). *Irreparable Harm to Quaker*[8]

■ Irreparable harm is harm "of a peculiar nature" for which "compensation in money alone cannot atone." *Opticians Ass'n of Am. v. Ind. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir.1990) (quoting *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir. 1987)). In covenant not to compete cases, the "nature of the right that is injured," i.e., the former employer's legitimate interest in protecting its business, makes equitable relief appropriate. *Nat'l Bus. Servs., Inc. v. Wright*, 2 F.Supp.2d 701, 709 (E.D.Pa.1998). An employer has a legitimate interest in preventing an employee from leaving to work for a competitor, carrying with him the employer's goodwill, specialized training, and confidential information. *Id.* " '[I]nterests that can be protected through covenants include trade secrets, confidential information, good will, and unique or extraordinary skills.' Similarly, not allowing competitors to profit from an employer's 'specialized training and skills' is a legitimate use of a covenant." *Victaulic*, 499 F.3d at 235 (quoting *Hess v. Gebhard & Co.*, 570 Pa. 148, 808 A.2d 912, 920 (2002), and *Morgan's Home Equip. Corp. v. Martucci*, 390 Pa. 618, 136 A.2d 838, 846 (1957)); *see also Coventry First, LLC v. Ingrassia*, 2005 WL 1625042, at * 11 (E.D.Pa. July 11, 2005) ("[I]nterference with customer relationships satisfies the irreparable harm requirement.... Because the violation of a covenant not to compete results in interference with customer relationships causing nonquantifia-

---

**7.** The Third Circuit has not been entirely clear in explicating the preliminary injunction standard, even after, in 1994, noting the confusion and attempting to settle the matter. *See Winback*, 42 F.3d at 1426 n. 8. While some cases require the balancing of all four factors, *see, e.g., Allegheny Energy*, 171 F.3d at 158, others require a plaintiff to prevail on the first two factors and then leave it to the Court's discretion to "examine" the last two factors, "[i]f relevant," *see, e.g., Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484 (3d Cir.2000). Regardless, here the plaintiff prevails on all four factors.

**8.** Quaker contends that, under the rule from *Bettinger v. Carl Berke Ass'n, Inc.*, 455 Pa. 100, 314 A.2d 296, 298 (1974), once a court finds a non-compete covenant prima facie valid, it should be enforced at equity *without even a showing of irreparable harm.* Admittedly, this seems to be rule from *Bettinger* under Pennsylvania law. However, a federal court must apply federal substantive law in examining the merits of a request for a preliminary injunction. *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir.1989). And federal law requires a showing of irreparable harm to the employer in order to issue a preliminary injunction.

ble damages, such covenants are prima facie enforceable in equity." (internal citations and quotation marks omitted)).

■ The *Coventry* court had little trouble finding that the employer would suffer irreparable harm to its customer relationships when a fired employee sought to work for a similar company. *Id.* Similarly, the court in *Telamerica Media Inc. v. AMN Television Marketing,* 1999 WL 1244423, at *6 (E.D.Pa. Dec.21, 1999), found that an employer's former president's competing with the employer in a new venture was "highly likely to result in un-compensable damage" to the employer. In *Telamerica,* the employee's knowledge of the former employer's "business practices" could be passed on to the new employer, and "a jury would have great difficult [sic] assessing the damage that the use of said information would cause, beyond that of an immediate loss of business." *Id.* Finally, the *Telamerica* court found it relevant that the non-compete agreement "explicitly states that damages are inadequate and that the parties agree to an injunctive remedy." *Id.* Such is also the case here, because in the covenant Varga "agree[d] that in the event of a breach or threatened breach ... of the restrictive covenant[ ] ... Quaker will suffer irreparable harm, and monetary damages may not be an adequate remedy.... Quaker shall be entitled as a matter of right to specific performance of the covenants contained herein by the way of temporary or permanent injunctive relief." As the *Wright* court held:

> ASI [the former employer] will suffer substantial injury if Wright [the employee] goes to work for Impact [the new employer]. Wright developed extensive customer relationships while employed by ASI, which constitute the goodwill of ASI. Wright also has a wide-ranging knowledge of ASI's business, products and customers, which would be impossible for her not to call on if she was working for ASI's direct competitor. As an employee of Impact, Wright's duties will certainly be in conflict with ASI's objectives, which are to sell its products and services and promote its goodwill. The potential injury to ASI's goodwill and the potential use of ASI's confidential information constitutes irreparable harm.

*Wright,* 2 F.Supp.2d at 709; *see also Fisher Bioservices, Inc. v. Bilcare, Inc.,* 2006 WL 1517382, at *12 (E.D.Pa. May 31, 2006) ("[I]njury to goodwill and the use of a company's confidential information are the types of injuries which would constitute irreparable harm that cannot be compensated with monetary damages."); *Graphic Mgmt. Assocs. v. Hatt,* 1998 WL 159035, at *17 (E.D.Pa. Mar.18, 1998) ("[The former employer's] business will be irreparably harmed. [The former employer] clearly has a legitimate business interest in prohibiting the [employee] from competing with [the former employer] and from contacting and soliciting business from or working as an employee for its customers.")

Here, Varga possesses extensive knowledge of Quaker's trade secrets and other confidential information, including specific information regarding existing customers and potential customers. As part of Quaker's senior management, Varga also carries with him Quaker's goodwill. Varga has a very real opportunity to harm Quaker's legitimate business interests by working for Stuart, and thus Quaker will likely suffer irreparable harm if Varga is allowed to work for Stuart.

### (c). *Harm to Varga*

■ If the Court enjoins Varga from working for Stuart for one year, Varga will, obviously, suffer some harm. He will not be able to work at the job of his choice.

*Cf. Wright,* 2 F.Supp.2d at 709 (noting that an employee "does not have a right to the ideal job, but rather, to be able to earn a livelihood"). Varga is sixty-two years old, has worked in the specialty chemicals industry for his thirty-four-year career, and is currently out of a job. His son will soon be going to college, and without his income from Stuart, financing his son's college education will be difficult.

However, in a case such as this, the harm to the employee almost always seems greater than the harm to the company. The employer, as a company—in this case, a very successful company, it appears—will be able to financially survive an employee's leaving for a competitor. And the employee, as an individual, apparently will have a hard time financially surviving if he is out of work. By this superficial calculus, the harm to the employee is always greater. *See Advanced Fox Antenna, Inc. v. Csaszar,* 1999 WL 54567, at *3 (E.D.Pa. Jan. 29, 1999) ("I conclude that granting plaintiff's preliminary injunction motion would impose greater harm upon defendant, an individual who would be unable to work in her chosen profession for a year, than that which would be imposed on plaintiff by denying one."); *Childers Prods. Co. v. Baxter,* 1989 WL 41344, at *8 (E.D.Pa. Apr. 21, 1989) ("The record shows that Mr. Baxter is the sole source of support for his wife and three children. Mr. Baxter stated that he would not know what employment he could pursue if this Court enjoined him from working for [the new employer]. Against these potentially grave consequences, [the former employer] spoke of lost sales for a corporate entity. . . ."). If this were the rule, no restrictive covenant would be enforced against a large and successful company.

But the numerous courts that have specifically enforced non-compete covenants against the employee have concluded that, regardless of the relative wealth of the employer and employee, the harm to the employer trumps the harm to the employee. *See Fisher,* 2006 WL 1517382, at *12; *Hatt,* 1998 WL 159035, at *18; *see also Wright,* 2 F.Supp.2d at 709 (noting that the employee will likely be able to obtain *some* employment, though not necessarily "a position as rewarding, in either monetary or career terms," as the one she was offered at a competitor).

Moreover, the fact that Varga, by resigning from Quaker and joining Stuart in spite of knowing about the non-compete covenant, brought this dispute on himself weighs against him here. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Napolitano,* 85 F.Supp.2d 491, 496 (E.D.Pa.2000) ("Significantly, any harm to Napolitano would be self-inflicted; he anticipated that Merrill Lynch immediately would seek to enforce its unambiguous employment contract, and chose to breach it nevertheless. The self-inflicted nature of any harm suffered by the wrongdoer (Napolitano) weighs heavily in favor of granting preliminary injunctive relief." (citing *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 806 (3d Cir. 1998))); *Hatt,* 1998 WL 159035, at *1 (refusing to allow a "high level officer of a company who betrayed his employer . . . to circumvent a covenant not to compete"); *Wright,* 2 F.Supp.2d at 709 ("[The employee] voluntarily left [the former employer], with full knowledge that [the former employer] would enforce the covenants against her; this factor is worth considering in balancing the harm to the parties."); *cf. Coventry First, LLC v. Ingrassia,* 2005 WL 1625042, at *9 (E.D.Pa. July 11, 2005) (noting that the fact that an employee was fired, rather than resigned, weighs in the employee's favor for invalidating the non-compete agreement). For example, Varga could have brought his interest in working for Stuart to Quaker's attention and

sought to be relieved of his obligations under the covenant, perhaps for some consideration. Instead, he accepted the job at Stuart and *then* quit Quaker, all with full knowledge of the terms of the non-compete covenant.

Therefore, while Varga will *obviously* suffer some harm, he brought that harm on himself and the harm is not necessarily greater than the potential harm to Quaker.

#### (d). *Public Interest*

■ The "public interest" prong is relatively amorphous. Most courts simply state—and this Court will join the chorus—that the public has an interest both in seeing a worker work in his chosen profession *and* in seeing freely-entered-into contracts enforced. The *Coventry* court provides good example:

> It is true that, as a matter of public policy, Pennsylvania courts are reluctant to enforce any contracts in restraint of free trade, particularly where they restrain an individual from earning a living at his trade. Nonetheless, it is generally in the public interest to uphold an agreement freely entered into by the parties.... [S]uch an injunction will further the public interest by protecting legitimate business interests that are recognized under Pennsylvania law, most especially, [the employer's] interest in customer goodwill.

2005 WL 1625042, at *12 (internal citations and quotation marks omitted).

In similar cases, courts have not been reluctant to hold that the public has a greater interest in seeing the non-compete covenant enforced than in allowing the employee to work in the new job. *See, e.g., Nextgen,* 2005 WL 3021095, at *13 ("There is an important public interest in enforcing contracts voluntarily entered, particularly those entered by knowledgeable and experienced businessmen...."); *Wright,* 2 F.Supp.2d at 709 ("The public interest is best served, in this case, by upholding the restrictive covenants...."); *Hatt,* 1998 WL 159035, at *19 ("Preventing Mr. Hatt from breaching the restrictive covenant with his former employer will discourage unfair competition, the misappropriation and wrongful use of confidential information and trade secrets, and the disavowal of freely contracted obligations.").

Indeed, as put by the *Hatt* court, "allowing the Defendant to freely violate his restrictive covenant ... would encourage Plaintiff's other employees to violate their restrictive covenants. Restrictive covenants only have value if they are enforced." 1998 WL 159035, at *18. As the Third Circuit recently recognized, restrictive covenants serve important business interests in today's economy. *See Victaulic,* 499 F.3d at 237 (noting that although non-compete covenants are technically "disfavored, Pennsylvania courts recognize that 'covenants have developed into important business tools to allow employers to prevent their employees and agents from learning their trade secrets, befriending their customers and then moving into competition with them'" (quoting *Hess,* 808 A.2d at 918)).

The Court therefore finds that it is in the public interest to enforce the restrictive covenant.

#### ii. *Balancing the Equities*

In determining whether to grant the requested preliminary injunction specifically enforcing the non-compete covenant, the Court looks primarily to the job that Varga left Quaker to do: the director of market development for Stuart's metals division. After the suit was filed, Stuart and Varga renegotiated and came up with a proposed "work-around": Varga would be the marketing director for the aluminum division only (with no responsibilities for steel). There are two important obser-

vations here. The first is that Varga's changing of his proposed job is almost a tacit admission that the job for which he was initially hired at Stuart unambiguously violated the non-compete covenant. The second observation is that the Court is not well-equipped to evaluate each prospective (and indeed, newly and specifically created) job at Stuart to determine if it violates the non-compete covenant. There may be *some* job for Varga at Stuart that would not violate the non-compete covenant, but Varga and Stuart are entitled to only one bite at the apple: they cannot keep offering different positions until they stumble upon one that falls outside the scope of the non-compete covenant. Rather, the job for which Varga was hired is the job that Varga has committed himself to for the purposes of the Court's decision on whether to issue the preliminary injunction.

Therefore, Varga's prospective job working in the metals division (steel and aluminum) would almost certainly violate the non-compete covenant, and it does support the Court's conclusion that Quaker is entitled to a preliminary injunction preventing Varga from working at Stuart for a year.

However, even if Varga's job were to be limited to the aluminum market, under the circumstances present here, Quaker would still prevail. The Third Circuit recently provided some factors that a court should consider in deciding whether a non-compete covenant can be specifically enforced over the employee's objections that the covenant is unreasonable because, though the employee is admittedly working for a competitor, he claims to be working in a different industry.

In *Victaulic*, the company, Victaulic, manufactured mechanical devices for use in a number of industries, including fire protection. 499 F.3d at 230–31. Tieman was a sales representative for Victaulic;

he had signed a non-compete agreement. Immediately upon leaving Victaulic's employ, Tieman began working for Tyco, one of Victaulic's direct competitors. Tieman argued that he was familiar only with Victaulic's fire protection products, so it would be unreasonable to prohibit Tieman from selling similar products for Tyco for use in other industries. The district court agreed with this argument, but the Third Circuit reversed. It held that the question of whether the prohibition from selling *any* Tyco products is reasonable is a fact-intensive inquiry. "Even if ... Tieman's job was limited to a small subset of Victaulic's products, we do not know how similar the various product lines are, how transferable knowledge of one product line is to the others, or whether there is substantial overlap in customers." *Id.* at 236. Thus, the Third Circuit strongly implied that if the product lines are similar, if knowledge of one product line is transferable to another, and if there is a substantial overlap in customers, then prohibiting the employee from working for a competitor, *even if the employee works only on a different product line,* is reasonable. The Third Circuit also stated that Victaulic might have a legitimate interest in protecting its "goodwill, trade secrets, and specialized training," especially if the goodwill, trade secrets, and specialized training in the fire protection industry are applicable in other industries. *Id.*

Here, the jobs to be performed for the aluminum and steel divisions are sufficiently similar. Indeed, Stuart originally hired Varga to do both. While the specific chemical formulas for the oils differ for steel and aluminum processing, the underlying theories behind the makeup of the chemical formulas is the same. Moreover, the role of a person in the marketing field is the same for both aluminum and steel: cultivate customer relationships with met-

al-working plants and market the specialty oils to those customers.

In short, the equities heavily weigh in Quaker's favor. Quaker will likely succeed on the merits of showing that Varga violated the non-compete covenant. Although Varga will suffer some harm if he is unable to work for Stuart for the year, Quaker will be irreparably harmed if Varga is allowed to work at Stuart during this year. The public has an interest in seeing both an individual pursue his chosen line of work *and* courts enforce reasonable contracts. The Court concludes that, balancing the equities,[9] Quaker has shown that it is entitled to prohibit Varga from working at Stuart for a year.

### 2. *Varga's Potential Disclosure*

This issue is, in spite of Quaker's apparent indignation, basically irrelevant at this stage. Varga's possible possession of Quaker's confidential information does not provide a sufficient basis for prohibiting Varga from working at Stuart.

Varga does not dispute that the information he copied contained Quaker's confidential trade secrets. Nor does he deny accessing the information when he knew he was prohibited from doing so. His position is that he made a mistake, a lapse of judgment, but that he no longer possesses any of Quaker's confidential information nor intends to disclose any of Quaker's information to Stuart.

The CFAA and the PUTSA permit a court to enjoin an individual from disclosing his former employer's trade secrets. 18 U.S.C. § 1030(g); 12 Pa. Stat. Cons. § 5303. But this is a moot point: Varga already knows, and indeed has represented to the Court, that he is obligated under Quaker's non-disclosure agreement never to disclose Quaker's confidential information. The Court will enjoin Varga from disclosing Quaker's confidential information. But Varga already concedes this point, and he readily agreed at the preliminary injunction hearing both to return any physical Quaker information to Quaker and to keep any knowledge of Quaker's confidential information confidential.

Quaker and Stuart have a history of trading employees back and forth. Each time an employee leaves Stuart and comes to Quaker, or vice versa, the new company erects safeguards to ensure that the employee does not disclose any of his previous employer's trade secrets. Moreover, the employees themselves have been trusted to self-police their activities. The Court does not see how this situation is any different. Whether Varga had copied the information to the storage device or not, he would still be prohibited from disclosing any of Quaker's confidential information to Stuart (or any other party). In other words, whether he has one of Quaker's chemical formulas on a storage device or in his head (through rote memorization,

9. Varga makes an equitable argument that the unclean hands doctrine estops Quaker from seeking to bar Varga from working for Stuart, because in 2002 Quaker allowed Varga to work at Quaker while Varga was still contractually obligated to Stuart not to compete with Stuart. This argument has no merit. Quite simply, Varga's agreement with Stuart was a non-*solicitation*, while his agreement with Quaker was a non-*compete*. An employee can leave Company A and go to work for a competitor, Company B, without violating Company A's non-*solicitation* agreement, so long

as the employee does not solicit any of Company A's customers while employed at Company B. However, it is far more difficult for an employee to leave Company A and go to work for a competitor, Company B, without violating Company A's non-*compete* agreement. While at Company B the employee might be segregated to a certain area or restricted in his work in order to maintain compliance with the non-solicitation agreement, but no amount of segregation or restriction within Company B will prevent the employee from *competing with Company A*.

perhaps), his non-disclosure agreement prevents him from providing that formula to Stuart. Invocation of the CFAA or the PUTSA is unnecessary here at the preliminary injunction stage. (Of course, whether Varga is liable for damages under the CFAA or the PUTSA, and if so, in what amount, is an altogether different question, and one that will be addressed when the case proceeds to trial.)

## IV. CONCLUSION

The non-compete covenant is reasonable. Balancing the equities, the Court will specifically enforce the non-compete covenant and enjoin Varga from working for Stuart until July 4, 2008.

In addition, the Court will specifically enforce the non-disclosure agreement and enjoin Varga from disclosing, to Stuart or anyone else, any of Quaker's confidential information, whether improperly copied by Varga or somehow otherwise possessed by him.

## ORDER

**AND NOW,** this 4th day of **September 2007,** pursuant to Federal Rules of Civil Procedure 52(a) and 65, following a hearing on the record on August 9, 2007, and for the reasons stated in the accompanying Memorandum, it is hereby **ORDERED** that Plaintiff's motion for a preliminary injunction (doc. no. 2) is **GRANTED.**

It is further **ORDERED** that Defendant is **ENJOINED** from commencing employment with D.A. Stuart Co. until July 4, 2008.

It is further **ORDERED** that Defendant is **ENJOINED** from disclosing any of Quaker's confidential information.

It is further **ORDERED** that Defendant shall return to Plaintiff any of Plaintiff's information currently in Defendant's possession, including but not limited to the USB storage device.

It is further **ORDERED** that Defendant shall file an answer to Plaintiff's complaint by **September 11, 2007.**

**AND IT IS SO ORDERED.**